BOYS' CLUB OF CLIFTON, INC., PLAINTIFF-APPELLANT, v. TOWNSHIP OF JEFFERSON, DEFENDANT-RESPONDENT.

Argued November 8, 1976—Decided March 1, 1977.

*Mr. Frank A. Carlet* argued the cause for appellant (*Messrs. Goldman, Carlet, Garrison and Bertoni,* attorneys).

*Mr. John M. Mills* argued the cause for respondent (*Messrs. Mills, Doyle, Hock and Murphy,* attorneys).

The opinion of the court was delivered by

SCHREIBER, J. This case concerns the tax exempt status of a 63.4 acre tract of land in Jefferson Township owned by the Boys' Club of Clifton, Inc. (Boys' Club), a nonprofit organization. The property had been acquired in 1966 and was tax exempt until its assessment for the years 1971 and 1972. The Boys' Club appealed to the Morris County Tax Board which affirmed the assessments. On the basis of a stipulated set of facts, the State Division of Tax Appeals reversed. The Appellate Division reversed and remanded for the presentation of a full evidential record and a decision based on that record. After a hearing, the State Division of Tax Appeals again found that the property was exempt. On appeal the Appellate Division reversed. 137 *N. J. Super.* 136 (1974). We granted certification. 70 *N. J.* 143 (1976).

The factual and legal issues concern *N. J. S. A.* 54: 4–3.6, which governs exemption of property of non-profit organizations.[1]

The statute in pertinent part reads as follows:

The following property shall be exempt from taxation under this chapter: . . . all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, . . . all buildings owned by a corporation created under or otherwise subject to the provisions of Title 15 of the Revised Statutes and actually and exclusively used in the work of one or more associations or corporations organized exclusively for charitable or religious purposes, which associations or corporations may or may not pay rent for the use of the premises or the portions of the premises used by them; . . . the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed 5 acres in extent; the furniture and personal property in said buildings if used in and devoted to the purposes above mentioned; . . . provided, in case of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit, except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings; provided, the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes.

Generally, the statute exempts from taxation: (1) the building(s) actually and exclusively used for one of the

[1] Art. VIII, § 1, par. 2 of the Constitution provides:

Exemption from taxation may be granted only by general laws. Until otherwise provided by law all exemptions from taxation validly granted and now in existence shall be continued. Exemptions from taxation may be altered or repealed, except those exempting real and personal property used exclusively for religious, educational, charitable or cemetery purposes, as defined by law, and owned by any corporation or association organized and conducted exclusively for one or more of such purposes and not operating for profit.

designated purposes; (2) the land on which the building(s) is located provided the land is necessary for the fair enjoyment of the building(s), is devoted to a designated purpose, and does not exceed five acres; and (3) the building(s) or the land is not used for profit and the organization is not a profit making institution.

The Boys' Club of Clifton was organized under Title 15 to promote the health, social, educational, vocational and character development of boys. In 1962 it acquired 33.25 acres of land, including a lake, in Jefferson Township. Intending it for a campsite, the club constructed approximately 28 buildings which consisted primarily of a mess hall, infirmary, recreation hall, bathhouse, eleven boys' cabins and four cabins for the staff. The Township designated this tract as lot 15, Block 307, and exempted the buildings and land from local real property taxes.

Finding that the camp could not be operated adequately because of the limited land acreage, the Boys' Club acquired two adjoining properties in 1966, one consisting of 63.4 acres and the other .45 acres. The larger tract has been designated lot 1A, Block 320. The Executive Director explained that the additional property was "absolutely necessary" for its program "to get these youngsters into a natural surrounding to conduct such programs as hiking, conservation, perhaps to get the youngsters to appreciate God and natural surroundings and conduct a variety of nature programs." He emphasized that the acreage was "necessary in order to reach the objectives and aims of the organization." With the annexation of the additional parcels, the campsite consisted of approximately 100 acres. Having satisfied the American Camping Association's requirement that there be one acre of land per camper, the Boys' Club was then accredited by the Association.

The camp was in full operation during eight summer weeks. The schedule was broken down into four two-week periods, approximately 100 different boys attended each term.

Between six to twelve campers slept in each of the dormitory cabins.

Snow Bowl, Inc. carried on a ski program in the vicinity of the camp area. Between November 1972 and March 1973, it rented some of these cabins on lot 15, Block 307 for living quarters for its staff at a time when the facilities were not used or needed by the Boys' Club. On one occasion in 1972 some 25 youngsters who had been skiing under the auspices of Snow Bowl, Inc. used the cabins for temporary overnight housing. Snow Bowl, Inc. paid Boys' Club $5,000 for the use of the cottages in the 1972-1973 winter.

In addition to Snow Bowl, Inc. college groups were permitted to use the area for ecology and nature studies. On these occasions Boys' Club charged $12.00 per person per weekend for reimbursement of its costs. Church groups were also permitted to occupy the facilities.

In 1970, the camping operation lost $3200; in 1971 the camp operated at a loss in excess of $15,000; in 1972 camp expenditures exceeded income by $1850.

Initially we note that the question of tax exempt status is directed only at lot 1A, Block 320. The Township has not assessed lot 15, Block 307 for either of the years in question, 1971 and 1972, and apparently concedes its tax exempt status. Lot 1A, Block 320, being a vacant tract, can only attain tax exempt status, however, on the basis of the buildings located on lot 15. *N. J. S. A.* 54: 4–3.6 makes it quite clear that the only land which may be exempt is that on which a building is erected and which "may be necessary for the fair enjoyment" of that building.

The Appellate Division, relying on *Sisters of Charity v. Cory,* 73 *N. J. L.* 699 (E. & A. 1907), held that lot 1A was not tax exempt, since it was acquired four years after lot 15. The Boys' Club has requested that we review the *Cory* decision. A summary of its facts and holding is therefore in order.

The Sisters of Charity lived in a building in which they also conducted a school. They occasionally purchased addi-

tional adjoining tracts of land until the total acreage comprised 316 acres. The land was farmed and the produce was consumed by the Sisters and the students. The Court of Errors and Appeals reasoned that the exemption applied only to "the land whereon the building is erected" and not to the subsequently purchased acreage. It held:

If it [the charity] acquires a tract of land and erects thereon a building which it devotes to uses exclusively charitable, and afterwards purchases other lands which it devotes to the same uses, such after-acquired property, whether it be adjacent to or located at a distance from the original building, is not within the exemption provision. [*Id.* at 703].

██ We no longer subscribe to this view. The fortuitous circumstances which determine the date that properties are acquired should not determine tax status. Suppose a church had been erected on a tract of land, part of which was paved for parking purposes. Undoubtedly the entire tract would be tax exempt. Yet, if the same parking area had been acquired after the church had been erected, could the Legislature have intended that the subsequently acquired tract was not entitled to exemption? We think not. We recognize that generally statutes granting exemptions from taxation are strongly construed against those seeking exemption, *Princeton Univ. Press v. Princeton,* 35 *N. J.* 209, 214 (1961), but that principle does not justify distorting the language or the legislative intent. *Pingry Corp. v. Hillside Tp.,* 46 *N. J.* 457 (1966). Justice (then Judge) Sullivan in interpreting the words "actually and exclusively used" which appear in *N. J. S. A.* 54:4–3.6 wrote in *Princeton Tp. v. Tenacre Foundation,* 69 *N. J. Super.* 559, 563 (App. Div. 1961):

However, the basic inquiry always is the legislative intent as expressed in the statute. To that end the construction, while strict, must always be reasonable, and the words are not to be given a rigid scholastic interpretation when it appears that they were used in another sense. The rule of strict construction must never be allowed to defeat the evident legislative design.

We are satisfied that the Boys' Club acquisition of lot 1A, Block 320, four years after it had purchased lot 15, Block 307, does not destroy its claim for tax exemption.

The statutory prerequisites for exemption, as previously indicated, involve (1) exclusive use of the building(s) and land; (2) need and quantity of land; and (3) non-profitability. We shall consider them in that order.

## I.

The statute requires that the buildings be *exclusively* used in the work of the organization and that the land also be devoted to those purposes and no other. The State Division of Tax Appeals mistakenly approached this problem by considering whether Snow Bowl's monetary contribution, proportionately figured at $2500 for 1972, was a significant profit making feature in the financial picture of the Boys' Club. But the statutory language and its intent are directed to the physical use of the property. Rental income may be a relevant fact in ascertaining who is using the property and whether that use is within a tax exempt category. The actual land and building use must be for one of the charitable, benevolent or religious purposes enumerated in the act.

Exclusive use does not necessarily contemplate occupancy by only the eleemosynary, religious or other qualified institution which owns the property. The statute preserves the exemption even though there may be occupancy by another charitable or religious organization which rents the premises. *See Trustees of Young Men's and Young Women's Hebrew Ass'n v. State Bd. of Tax Appeals,* 119 *N. J. L.* 504 (Sup. Ct.), aff'd o. b. 121 *N. J. L.* 65 (E. & A. 1938) and *L.* 1949, *c.* 85, § 1.[2] Accordingly, the off season use of the

---

[2] The 1949 amendment to the tax statute provided exemption for "all buildings owned by a corporation created under or otherwise subject to the provisions of Title 15 of the Revised Statutes and actually and exclusively used in the work of one or more associations

facilities and area by church groups would not destroy the Boys' Club's right to an exemption. However, occupancy by an organization other than a charitable or religious one, such as an educational institution, would destroy the tax exempt status.[3] There is evidence in the record that on some occasions college students entered the premises to study the ecology and soil conservation. However, their use was so inconsequential that Jefferson Township has never contended this usage impaired the exemption. Those circumstances were comparable to the situation when the youngsters stayed in the cabins overnight during the 1972 winter. Such usage was emergent, non-recurring, and *de minimis*. Such *de minimis* use would not impair Boys' Club's tax exempt status.

It is undisputed that in November and December 1972 Snow Bowl, Inc. rented and used some of the buildings. However, usage in those months would not affect the tax exempt status for the year 1972 because under the statute then in effect, the exemption would not be lost until the following January.[4] Insofar as 1971 is concerned, no

---

or corporations organized exclusively for charitable or religious purposes, which associations or corporations may or may not pay rent for the use of the premises or the portions of the premises used by them." *L.* 1949, *c.* 85, § 1.

[3]When the act was amended in 1949 to permit charitable and religious organizations to use buildings which were entitled to tax exemption because of the status of the owner, the Legislature intentionally did not include educational bodies as a permitted user. Assembly Bill 281 (1949) had provided for use by charitable, educational or religious organizations. The amendment was enacted without the educational classification, which had been deleted in the Senate.

[4]Whenever tax exemption ceases by reason of a change in use, the property is assessable as omitted property. *N. J. S. A.* 54:4–63.26. If that occurred between October 1 and January 1, the property would be assessed and taxed as of January 1 for the tax year beginning January 1. If the right to the exemption ceased after January 1, the property would be assessed on the first day of the following month, the tax to be proportioned on the basis of the months remaining in the calendar year. *N. J. S. A.* 54:4–63.28. The

question arises because Snow Bowl, Inc. first rented the cabins in 1972.

## II.

Turning to the issue of the extent of land which may qualify, we are satisfied that the statute does not restrict the exemption to the precise land on which the building is located. Otherwise the statutory language need not have specified all the land "necessary for the fair enjoyment" of the buildings. *Congregation B'Nai Yisroel v. Millburn Tp.,* 35 *N. J. Super.* 67, 70 (App. Div. 1955).

It is also settled that the amount of land which may be exempted is limited to five acres per building.[5] *Pingry Corp. v. Hillside Tp.,* 46 *N. J.* at 465–466. Therefore, because there are 28 buildings and approximately 100 acres, the entire land area is potentially exempt.

In addition to the acreage limitation the land must be "necessary for the fair enjoyment" of the building. The phrase refers to the *use* of the building. "Necessary" in the context here does not mean absolutely indispensable. Rather it refers to what is reasonably necessary to accomplish the institution's purposes. Thus in the parking lot example referred to above, the test of reasonable necessity may well encompass parking accommodations for a church's parishioners. So, here, the camp buildings should be considered in the context of a boy's camp. The eating, sleeping and medical quar-

statute was amended as of October 1, 1974 to provide for the proportionate method of allocating the tax irrespective of the month in which the exemption status terminated. *L.* 1974, *c.* 103, § 2. The amendment became effective October 1, 1974 and would have no bearing with respect to prior years.

[5]The original statute, *L.* 1851, § 5.II, contained no acreage limitation. In 1862 the five acre limitation first appeared in the format of the total amount of land which could be exempt for "each" college or other institution. *L.* 1862, *c.* 194, § 17. The existing language restriction of five acres was adopted in the 1918 revision. *L.* 1918, *c.* 236, § 203.

ters, as well as the surrounding land, are all integrated components necessary for the proper operation of the camp.

Although there is little discussion in our cases concerning the concept of what is necessary for fair enjoyment, some authority here and elsewhere supports the position we have adopted. In *Congregation B'Nai Yisroel v. Millburn Tp.*, 35 *N. J. Super.* 67 (App. Div. 1955), a parking lot for a synagogue was conceded to be "necessary" for the fair enjoyment of the building and its tax exempt status was not eliminated when a public street subsequently severed the lot from the building. In *In the Matter of the Application For Judgment Against Lots Eight and Nine, 27 Minn.* 460, 8 *N. W.* 595, 596 (1881), where two lots adjoining a hospital were used as a .vegetable garden for the benefit of the hospital, the exemption was extended to the lots because the adjacent ground was "reasonably necessary or appropriate to the purposes and objects in view, and [was] used directly for the promotion and accomplishment of the same." In *Hoboken v. Division of Tax Appeals*, 134 *N. J. L.* 594, 598 (Sup. Ct. 1946), college athletic fields were held to be exempt because they were "essential for the proper and functional use of" three dormitories. *See Annotation,* "Extent of area within tax exemption extended to property used for educational, religious, or charitable purposes," 134 *A. L. R.* 1176 (1941).

The Division of Tax Appeals made the following factual findings:

The petitioner is a non-profit corporation organized under Title 15 of R. S. of N. J. and its purpose broadly stated is the promotion of welfare of boys. It operated a summer camp on the premises in question and the adjoining property. In order to operate more efficiently and to obtain accreditation by the American Camping Association; the petitioner in 1966 purchased the 63.4 acres. This gave it 100 acres and since the American Camping Association requires 1 acre per camper, the petitioner obtained accreditation for 100 campers. There were other requirements that were required and fulfilled. The extra land was needed and used specifically for pioneer camping, a program in which campers trail blaze to a suitable location on the lands and set up an area for a three to four day stay. The lands also are used in an attempt to teach the camper

to know a supreme being in his natural surrounding and to practice conservation. In addition, instruction is given on said lands in self-preservation, existence in wooded areas, map and compass reading and astronomy. Further, the lands are used for conservation and ecological programs such as tree planting, soil testing and natural treasure hunts in addition to hikes and nature study.

The Appellate Division did not quarrel with these findings and the record contains substantial evidence in their support. Consequently, we are satisfied that lot 1A was used as, and became an integral part of, the camp function, for which the 28 buildings on lot 15 were utilized and occupied.

Jefferson Township's tax assessor testified that he would exempt one quarter of an acre for each boy's cabin. He fixed this amount on the basis of his experience with one family homes. But that approach ignored the purpose of the camp project. Accomplishing the camp's purpose, the moral and mental improvement of the campers, reasonably required all the acreage. The cabins should not have been considered simply as sleeping quarters. In the statutory context, the cabins were to house boys who were at that location to enjoy and participate in an educational and character development experience which depended in part on the natural environment afforded by the 63 acres in lot 1A. We concur in the Division's findings that the land was "necessary for the fair enjoyment" of the camp buildings.

### III.

The last prerequisite for exempt status is that the buildings, land and institutions may not be conducted for profit, N. J. S. A. 54:4-3.6. The only income data in the record for the camp operation, which is only one facet of the Boys' Club's activities, indicate that expenditures exceeded income in the calendar years 1971 and 1972. Furthermore, the total operating income of the Boys' Club in those years had been substantially less than its expenditures. Accordingly, Boys' Club has satisfied the non-profit criteria. Even where a particular operation has produced a profit, the

tax exempt status has not been lost when the excess funds have been applied to carry out the organization's beneficent policies. *Kimberley School v. Town of Montclair,* 2 N. J. 28 (1949); *Trenton v. N. J. Div. of Tax Appeals,* 65 N. J. *Super.* 1 (App. Div. 1960). *Compare Bloomfield v. Academy of Med.,* 47 N. J. 358 (1966) (tax exempt status upheld where all income devoted to public purposes) *with Princeton Univ. Press v. Princeton,* 35 N. J. 209 (1961) (tax exempt status denied where educational organization between 1947 and 1957 earned substantial profits in eight years from printing activities).[6]

We are satisfied that Boys' Club has sustained the burden of proving that lot 1A, Block 320 is entitled to tax exemption for the years 1971 and 1972. *Bloomfield v. Academy of Med. of N. J.,* 47 N. J. at 363.

To summarize we hold that: (1) where buildings are owned by an association or corporation whose status satisfies the requirements of *N. J. S. A.* 54:4–3.6, such as a corporation, like the Boys' Club, organized exclusively for the moral and mental improvement of children, whose buildings are used actually and exclusively for its beneficent purposes; (2) where the land on which the buildings are located as well as adjacent and adjoining properties, irrespective of the date of acquisition, is devoted exclusively to the same or similar purposes of the institution, and the land usage is reasonably necessary for the purposes and functions related to the utilization of the buildings, and does not exceed five acres per building; and (3) where the organization's operations are not conducted for profit or, if the land and buildings in question are operated profitably, the excess funds are applied to the institution's commendable objectives, then such buildings and land are entitled to exemp-

---

[6]Although the rationale of the *Princeton* decision is related to exclusivity in the sense that commercial printing was being carried on, it could also be argued that the activity was profit making.

tions from local real property assessments and taxes in accordance with *N. J. S. A.* 54:4–3.6.

The judgment of the Appellate Division is reversed and judgment is to be entered directing that lot 1A, Block 320 be exempt from real property taxation by the Township for the years 1971 and 1972.

 Boys' Club had filed a cross appeal for the years 1973 and 1974, but no appeals had been taken from the assessments for those years and the Appellate Division dismissed the cross appeals. In our opinion appeals should have been taken for each of those years. Although no appeal would have been necessary under the "freeze" statutes, *N. J. S. A.* 54:2–43 and *N. J. S. A.* 54:3–26, those acts provide that the judgment with respect to valuation in one year "shall be conclusive and binding . . . for the assessment year and for the 2 assessment years succeeding the assessment year covered by the final judgment . . . ." *Union Terminal Cold Storage Co. v. Spence,* 17 *N. J.* 162 (1954). No such provisions are found in the statutes involving tax exempt status. The duty of the municipal assessor to obtain a statement from the owner concerning the exempt status of the property every three years, *N. J. S. A.* 54:4–4.4, does not excuse the owner from filing an appeal, even though a judgment of exemption had been entered for the prior year.

 To the extent that the decisions of *Catholic Charities of Diocese of Camden v. Pleasantville,* 109 *N. J. Super.* 475 (App. Div. 1970) and *City of Newark v. Essex County Bd. of Taxation,* 110 *N. J. Super.* 93 (Law Div. 1970) are inconsistent with today's decision, they are overruled. Here, Boys' Club, relying upon these decisions, did not file appeals for the years 1973 and 1974. Under these circumstances, we shall remand the matter to the State Division for consideration of petitioner's claims and receipt of relevant evidence for 1973 and 1974, since the taxpayer is deemed to have filed *nunc pro tunc* appropriate appeals for those years. *Cf. Patrolman's Benevolent Association v.*

*Montclair*, 70 *N. J.* 130 (1976). We do not retain jurisdiction.

CONFORD, P. J. A. D., Temporarily Assigned, dissenting. In reversing the Appellate Division decision in this matter, the court, in my view, basically recasts the legislative tax exemption on behalf of schools, churches, hospitals and miscellaneous other benevolent and charitable institutions (*N. J. S. A.* 54:4–3.6) from one of buildings, with only incidental and limited exemption of appurtenant land, so as to extend it to exemption of lands used for such purposes in gross. This determination can have very extensive fiscal implications for our hard pressed municipalities. It constitutes a basic change in tax policy heretofore accepted as the legislative intent for at least 70 years, *Sisters of Charity v. Cory, Coll'r*, 73 *N. J. L.* 699 (E. & A. 1907); *Stevens Institute v. Bowes*, 78 *N. J. L.* 205 (Sup. Ct. 1909), and as such constitutes a determination which should be made only by the Legislature, not the judiciary.

The very tenor of the statute, even as partially set out in the Court's opinion, emphasizes the legislative intent that the primary object of the tax exemption is "buildings" used for the stated purposes. "Land" is exempted only if the land

 (a) is that "whereon * * * the buildings are erected";
 (b) "which may be necessary for the fair enjoyment thereof";
 (c) "which is devoted to" the exempted purpose; and
 (d) "does not exceed 5 acres in extent".

Analysis will disclose that exemption of lot 1A here involved (63.4 acres) would violate the statute in respect of requisites (a), (b) and (d) aforementioned.

As to (d), the 5-acre limitation, it is settled that the statute allows *up to* 5 acres of land for each exempted building. *Pingry Corp. v. Hillside Tp.*, 46 *N. J.* 457, 465 (1966). This does not mean, however, that the owner is necessarily entitled to an exemption of that number of acres of land

represented by the product of the number of buildings multiplied by five. Each building is entitled to a maximum of five acres of land exemption, but only if and to the extent necessary for the fair enjoyment *of that building*. If the fair enjoyment of a group of buildings is feasible within a five-acre tract, five acres is the limit of the allowable land exemption, not five times the number of buildings. This principle is illustrated by *Institute of Holy Angels v. Bender*, 79 *N. J. L.* 34 (Sup. Ct. 1909), cited as authoritative in *Pingry Corp. v. Hillside Tp., supra* (46 *N. J.* at 465). In *Bender*, a seven-acre tract on which a number of exempt buildings of the subject school was situated was held exempt only to the maximum of five acres for the group. The land in excess over the five acres was held taxable, the court apparently regarding the remainder as not necessary for the fair enjoyment of the buildings. 79 *N. J. L.* at 36–37.

Consistently with the foregoing, this Court in the *Pingry Corp.* case, *supra,* cited with approval the Assessors Law Manual of the Local Tax Bureau, Division of Taxation, which indicated that "the assessor [was] to examine the land to determine what amount of acreage [was] 'necessary to the fair enjoyment *of the subject building',* but that in any event no land in excess of five acres for each building should be exempted". 46 *N. J.* at 466. (emphasis added).

Applying the foregoing principle to the instant facts, it would appear highly unlikely that each of the fifteen sleeping cabins occupied by the campers and the staff required a separate five acres of land for its fair enjoyment. The same applies to the miscellaneous other buildings on lot 15, the original camp site, with which lot 1A is sought to be joined as an integral exempt whole. There is no basis within this record to find that the 33 acres of lot 15 were not adequate in the aggregate to provide for the fair enjoyment of all of the 28 structures situated thereon before the acquisition of lot 1A.

I appreciate, of course, that the Court's thesis is that the camp lands on lot 1A may fairly be regarded as necessary

for the prosecution of an integrated camping project as an entirety. But a concession of the validity of that proposition is not a concession of entitlement, in the legislative contemplation, of exemption of the entire 97 acres of land. The statute does not grant unqualified exemption of all property, undifferentiated, used for the favored purposes specified therein. It clearly contemplates that the building is to be "the principal factor in the scheme" of exemption, *Children's Seashore House v. Atlantic City*, 68 *N. J. L.* 385, 390 (E. & A. 1902), and that the land exemption is appurtenant to that of the buildings and extends only to such land as is necessary for the fair enjoyment of a specific building (not to exceed five acres per building).

The Division of Tax Appeals found these to be the uses of the land on lot 1A:

> The extra land was needed and used specifically for pioneer camping, a program in which campers trail blaze to a suitable location on the lands and set up an area for a three to four day stay. The lands also are used in an attempt to teach the camper to know a supreme being in his natural surrounding and to practice conservation. In addition, instruction is given on said lands in self-preservation, existence in wooded areas, map and compass reading and astronomy. Further, the lands are used for conservation and ecological programs such as tree planting, soil testing and natural treasure hunts in addition to hikes and nature study.

It is obvious that these pursuits are quite unrelated to the fair enjoyment of the buildings on lot 15, *e. g.*, the sleeping cabins. They would qualify lot 1A for exemption if the statute exempted "lands" used for charitable or benevolent purposes, rather than "buildings" with the qualified exemption of lands appurtenant thereto which we find in the statute. *Cf. Children's Seashore House v. Atlantic City, supra.*

Under the fundamental principle of strict scrutiny of claims for exemption from taxation, *Princeton Univ. Press v. Princeton*, 35 *N. J.* 209 (1961), the Boys' Club has failed to establish that any of the land in lot 1A, much less all of it, is necessary for the fair enjoyment of the *buildings* on

lot 15, or any of them, in any sense fairly contemplated by the pertinent statutory requisite.

The thesis maintained above is abetted by the express statutory requirement that the land sought to be qualified for exemption must be shown to be that whereon the buildings are erected. This has been held to mean that the land must be in the nature of the curtilage of the building — the building being the primary object of the intended exemption. *Stevens Institute v. Bowes, supra* (78 *N. J. L.* at 208). The statutory specification that the only land subject to exemption as related to an exempted building is that upon which the building is erected is so plain and unambiguous that our courts have always felt obliged to enforce it with strictness. Thus, in *Children's Seashore House v. Atlantic City, supra* (68 *N. J. L.* at 388–389) the Court said: "And such exemption can only be extended under the statute to the land on which the buildings are erected, and not to its lands elsewhere". And, of most authoritative pertinence, is the decision of the Court of Errors and Appeals in *Sisters of Charity v. Cory, Coll'r, supra,* which was regarded as dispositive by the Appellate Division. At the time of that decision the 5-acre limitation was not a part of the exemption statute. The owner organization sought exemption for a tract of 316 acres of land part of which was acquired after the erection of the exempt building. In denying exemption for the after-acquired land the Court said (73 *N. J. L.* at 702) :

The language of the exemption clause, as it stood upon the statute book in 1890, is that "all buildings used for charitable purposes, with the land whereon the same are erected, and which may be necessary for the fair enjoyment thereof, shall be exempt," &c. The primary object of the exemption is the building. Included with it in the exemption is a certain portion of land. Not *all* the land held in the same ownership and used for the same purposes, but only *the land whereon the building is erected.* These words are plainly words of limitation. No land of a charitable organization other than that upon which its building has been erected is exempted from taxation under this provision of the act. If it acquires a tract of land and erects thereon a building which it devotes to uses exclusively charitable, and afterwards purchases other lands which it devotes

to the same uses, such after-acquired property, whether it be adjacent to or located at a distance from the original building, is not within the exemption provision. It is not the land upon which the building is erected. This limitation in the statute is just as clearly expressed, and should be given as much force as that which declares that only so much of the land upon which the building is erected as may be necessary for its fair enjoyment shall escape taxation. The statute creates a double test, to be applied for the purpose of determining whether or not a given parcel of land is entitled to exemption from taxation — *first*, is it the very tract upon which the building was erected, or does it include land acquired at a period subsequent to the erection of the building? *Second*, if it is the tract upon which the building was erected, then is all of it necessary for the fair enjoyment of the building? Lands which do not meet the double test cannot escape taxation. It follows, therefore, that those parcels of land belonging to this charitable organization which have been acquired by it since the erection of its original building, and upon which no buildings have been erected which are exclusively devoted to the purposes of its organization, are not exempted from taxation by virtue of the provision of the General Tax law which has been referred to.

(emphasis in the original).

It seems to me impossible to evade the logic of the foregoing reasoning. Equally compelling is the fact that the Legislature has never changed the statute to alter that adjudicated construction. Yet I would be tempted to modify the rigor of the *Cory* rationale to allow an exemption for after-acquired land if the purpose and the nature of its use were so closely related to the direct physical use of the exempted building that the expanded tract could nevertheless still be regarded, in the common understanding, as the curtilage of the building. An added parking lot for a church or school would be an apt example. But to go to the extent of the decision of the Court in the instant case is to read out of the statute any realistic significance of the statutory language, "the land whereon any of the buildings * * * are erected". In no reasonable sense are the 28 buildings situated on lot 15 to be regarded as "erected" on the 63-acre lot 1A. As already indicated, and here restated for emphasis, I believe that in dealing with a tax exemption statute a court is

simply without warrant to disregard plain and unambiguous legislative language to confer an exemption not qualifying therewith merely because the court believes it to be good policy or sensible to reach that result. The public revenues are solely for the dispensation of the elected legislative body.

In any case, I believe the court may not confer jurisdiction on the Division of Tax Appeals to consider a claim for exemption for the tax years 1973 and 1974. No appeals were filed with the county board of taxation from the assessments for those years, and it is therefore clear that the Division of Tax Appeals is without jurisdiction over the subject matter of the assessments for those years. *Hackensack Water Co. v. Division of Tax Appeals,* 2 *N. J.* 157, 164–165 (1949). Since *Camden v. Pleasantville,* 109 *N. J. Super.* 475 (App. Div. 1970), certif. den. 56 *N. J.* 474 (1970) and *City of Newark v. Essex County Bd. of Taxation,* 110 *N. J. Super.* 93 (Law Div. 1970), reach a different result without consideration of the controlling effect of the *Hackensack Water Co.* case, I agree with the Court that they should be overruled.

However, I disagree with the Court's conclusion that the Division of Tax Appeals is vested with jurisdiction over the assessments for the tax years 1973 and 1974 because appellant relied upon the holdings in the last mentioned cases in not having filed county board appeals for those years. Nothing can create subject-matter jurisdiction of a court or of a special statutory tribunal if the constitutional or statutory prerequisites to such jurisdiction have not been satisfied. 21 C. J. S. *Courts* § 35 b, p. 45. Thus, neither waiver nor consent confers jurisdiction where the tribunal otherwise has no jurisdiction over the subject-matter. *De Feo v. Recorder's Court of Belleville,* 129 *N. J. L.* 549, 550 (Sup. Ct. 1943). Accordingly, the majority's thesis that appellant's reliance upon past decisions (which I do not concede has been shown here) can create subject-matter jurisdiction has no jurisprudential foundation. *Cf. Hartford Ins. Co. v. Allstate Ins. Co.,* 68 *N. J.* 430 (1975).

412

*For reversal and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER—6.

*For affirmance*—Judge CONFORD—1.