TOWNSHIP OF CLINTON, PLAINTIFF, v. CAMP BRETT–ENDEAVOR, INC., A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.

Tax Court of New Jersey

March 7, 1980.

*Roger M. Cain* for plaintiff (*Felter, Cain & Shurts*, attorneys).

*Robert L. Alexander* for defendant (*Herrigel & Alexander*, attorneys).

CONLEY, J. T. C.

This case presents the issue of whether a year-round residence at a summer camp should be exempt from real property tax pursuant to *N.J.S.A.* 54:4–3.6. The assessor of Clinton Township granted an exemption to Camp Brett-Endeavor for the year 1975 for all of its buildings and acreage except for the residence of the camp's director/caretaker and 25 acres of land. Camp Brett-Endeavor appealed to the Hunterdon County Board of Taxation, which granted an exemption for the residence and for an additional five acres of land. Clinton Township has appealed to this court for a restoration of the assessments.

The Legislature has granted an exemption from real property tax with regard to certain property of nonprofit organizations. The exemption is set forth in *N.J.S.A.* 54:4–3.6, the relevant language of which is as follows:

> The following property shall be exempt from taxation under this chapter: . . . all buildings actually and exclusively used in the work of associations and corporations organized exclusively . . . for religious, charitable or hospital purposes, or for one or more such purposes; . . . .

The only aspect of the statutory standard in dispute in the present case is whether the residence of the director/caretaker is "actually and exclusively used in the work of" Camp Brett-Endeavor. Clinton Township takes the position that the house is principally a private residence like other private residences in the community and that it should bear its share of the local tax burden. Camp Brett-Endeavor argues that it is essential to the security of its nonprofit camping activities to provide a year-round home for a full-time director/caretaker.

Our courts have not previously considered the issue of tax exemption of a permanent residence at an otherwise exempt charitable summer camp. It is therefore instructive to review those cases in which courts have considered the same exemption language in connection with residential premises of a religious, charitable or hospital organization. The standard for exemption in these cases is strict. Residential premises of religious, charitable or hospital organizations must be "actually and exclusively used in the work of" the organization. Residences at "colleges, schools, academies or seminaries," need only be "actually used" for institutional purposes pursuant to *N.J.S.A.* 54:4–3.6. *See Pingry Corp. v. Hillside Tp.,* 46 *N.J.* 457, 461–463, 217 *A.*2d 868 (1966); *Teaneck Tp. v. Lutheran Bible Institute,* 20 *N.J.* 86, 118 *A.*2d 809 (1955). As a consequence, cases construing the less strict clause of the exemption statute dealing with institutions such as schools and colleges are not applicable to the case at hand.

The only occasion the Supreme Court has had to consider the relevant portion of *N.J.S.A.* 54:4–3.6 was in *Teaneck Tp. v. Lutheran Bible Institute, supra.* The court in that case reiterated a basic premise in this type of case, that "all doubts are resolved against those seeking the benefit of a statutory exemption which in turn is based upon the fundamental principal [*sic*] of equality of the tax burden." 20 *N.J.* at 90, 118 *A.*2d at 811.

The court held that three faculty residences owned by the Lutheran Bible Institute were not entitled to an exemption. Each of the three residences was occupied by a minister (one was the dean of the school) and his family. The court said:

> The buildings in question are not exclusively used in the religious educational endeavor of the Institute. The predominant utility is a residential accommodation, a home provided for the several members of the faculty and their respective families where students are invited to call and discuss matters of mutual interest and concern if they so desire. The fact that the clergymen maintain a study in their home does not alter its essential characteristic nor is the geographical location of the residences from the Institute [two miles] a decisive factor. The use to which the buildings are devoted is not within the statutory requirement. [20 *N.J.* at 91, 118 *A.*2d at 811]

The Appellate Division has construed the relevant exemption clause, "actually and exclusively used in the work of" an organization, in relatively few cases, all subsequent to the *Teaneck Tp.* case: *Princeton Tp. v. Tenacre Foundation,* 69 *N.J.Super.* 559, 174 *A.*2d 601 (App.Div.1961); *International Missions, Inc. v. Lincoln Park,* 87 *N.J.Super.* 170, 208 *A.*2d 431 (App.Div.1965); *Cresskill v. Northern Valley Evangelical Free Church,* 125 *N.J. Super.* 585, 312 *A.*2d 641 (App.Div.1973); *Long Branch v. Monmouth Medical Center,* 138 *N.J.Super.* 524, 351 *A.*2d 756 (App. Div.1976), aff'd o. b. 73 *N.J.* 179, 373 *A.*2d 651 (1977); and *Harvey Cedars v. Sisters of Saint Elizabeth,* 163 *N.J.Super.* 564, 395 *A.*2d 518 (App.Div.1978).

In *Princeton, supra,* the court upheld the granting of a tax exemption for the permanent residence of the director of the Foundation. The house was on the Foundation's premises, newly-built, large enough for the director's family and used for many Foundation activities and purposes. The township argued that the predominant use of the premises was for the permanent personal residence of the director and his family and that therefore the building could not be "actually and exclusively used" in the work of the Foundation. The court concluded that the nature and extent of the director's duties were such that he was on call virtually 24 hours a day as a combination business manager and hospital administrator, and that "the operational convenience of the Foundation is greatly served by the location of the residence of the director in close proximity to the institu-

tion itself." *Id.*, 69 *N.J.Super.* at 562, 174 *A.*2d at 603. The court found that the maintenance of a residence for the director on the Foundation's property was "reasonably necessary for the efficient functioning of the institution," and thus the dwelling was "actually and exclusively used" in the work of the Foundation within the meaning of *N.J.S.A.* 54:4-3.6. *Id.* at 565, 174 *A.*2d at 605.

In distinguishing *Teaneck*, the court in the *Princeton* case said that the Bible Institute had provided housing accommodations to its minister-teachers and their families "as a convenience to them," and that the "maintenance and location of these accommodations were not material to the Institute's operation." With respect to the facts before it the *Princeton* court said:

> In contrast the instant case presents a situation where the housing facilities are being provided, not for the director's convenience, but rather because it is essential to the operation of the Foundation that the director be available on the premises 24 hours a day to serve the Foundation's needs. In such a situation the Foundation must provide living accommodations for the director on the grounds.
>
> We rest our decision on the proposition that the director's residence, as such, is an integral part of the institution's facilities and, therefore, is actually and exclusively used in the work of the Foundation within the tax exemption provision of *N.J.S.A.* 54:4-3.6. [69 *N.J.Super.* at 565-566, 174 *A.*2d at 605]

In *International Missions, Inc., supra,* a charitable organization with offices in Jersey City claimed an exemption for the home of its office manager and his family in the Borough of Lincoln Park. The home consisted of six rooms, one of which was used one day a week by the office manager, the rest of his time being spent in Jersey City. The court held that the residence was not "actually and exclusively used" in the Mission's work because its primary use was as a residence for the office manager and his family and, as such, was not tax exempt.

*Cresskill, supra,* dealt with the residence of a church's youth director and his wife. The church argued that in addition to its use as a residence, the building was utilized also in the general religious work of the church as a meeting place for Sunday school classes and for various other church activities. Without examining any authority other than the appropriate clause of *N.J.S.A.* 54:4-3.6, the court denied the exemption, holding that

"[a] building that is used in the religious work of a church and which is additionally utilized as the residence of an employee of the religious corporation . . ., quite obviously is not being devoted exclusively to religious purposes in the ongoing work of the church." 125 *N.J.Super.* at 587, 312 *A.2d* at 642.

In *Long Branch, supra,* the court dealt with various properties owned by Monmouth Medical Center, which operates a hospital providing general hospital services. One of the properties, called the Borden Apartments, located about a block and a half from the hospital entrance, was used exclusively as residences for resident physicians, interns and nurses on the hospital's staff. The court concluded that the furnishing of residences to hospital staff was "reasonably necessary for the proper and efficient operation of the hospital," expressly following the test set forth in *Princeton Tp. v. Tenacre Foundation, supra.* The court stated:

> It cannot be seriously disputed that the operation of a large general hospital, such as the Center, requires the presence of properly qualified resident physicians, interns and nurses. The evidence established that the substantially lower rentals charged by the Center to the resident physicians, interns and nurses served as a subsidy to attract qualified people to its staff. Furthermore, it is obvious that by providing housing facilities for its resident physicians, interns and nurses in or near the hospital, the Center is better able to function properly and efficiently on a 24 hour basis. The landlord-tenant relationship existing between the Center and its resident physicians, interns and nurses renting the apartments is secondary to the primary purpose of providing housing for such needed personnel. Furthermore, the Center did not operate the building at a profit. . . . In these circumstances, we hold that the Borden apartments are an integral part of the Center's facilities and "actually and exclusively used" to carry out its hospital purposes. [138 *N.J.Super.* at 533, 351 *A.2d* at 761]

*Harvey Cedars, supra,* involved a complex of buildings used as a facility for rest and relaxation of sisters and clergy during the summer season. One of the buildings was the residence of Sister Ann, the administrator of the complex who lived on the property all year. The court stated that the test to be applied was whether a building was "reasonably necessary" for the charitable purpose, citing *Long Branch, supra.* It denied an exemption for all the buildings except a chapel. The court made the following statement applicable to all buildings other than the chapel:

> Here the substantial use of the property as a summer residence or vacation spot for sisters and others who do charitable work elsewhere mandates that the property be denied exemption even though it is also used in part for religious retreats. Providing vacation facilities can simply not be viewed as reasonably necessary for the work of the organization. . . . In this regard residences for personnel or religious organizations at a great distance from their place of work and not necessary for the accomplishment of the purposes of the charity are not entitled to tax exemption. [163 *N.J.Super.* at 568–569, 395 *A.*2d at 520]

No specific mention was made of Sister Ann's year-round residence. Presumably, the court denied an exemption for the administrator's residence because the retreat facility of the Sisters of Saint Elizabeth which she administered was not itself entitled to an exemption.

■ The cases discussed above establish a two-fold test to be applied in the case of an application for exemption involving a residential property owned and used by a religious, charitable or hospital organization whose other property is exempt from local property tax: first, whether the residence is predominantly used as an integral part of the operation of the exempt organization, rather than being primarily a convenience to the tenant, and second, whether the provision of the residence is reasonably necessary for the proper and efficient operation of the exempt organization. This test must be applied to the facts of the present case.

The essential facts are not in dispute. Camp Brett-Endeavor owns a total of 85.7 acres in Clinton Township. All but 25 acres were granted an exemption for 1975 by the Clinton Township assessor. As of 1972 there were 13 buildings on the property. One building was an administration or headquarters building that included a dining hall and kitchen. There were five cabins for campers and miscellaneous other outbuildings. A caretaker's residence of approximately 16 x 20 feet was enlarged in 1972 by an 18 x 22 foot addition. The expanded cottage consisted of a living room, dining room, kitchen, two bedrooms and a bath. The camp property also had a swimming pool. The residential property that is involved in this case is a two-story frame home built in 1974 containing approximately 2,000 square feet of living space. The rooms include a living room, dining room,

kitchen, family room or recreation room, office, four bedrooms, one full and two half baths and a laundry room. It has a fireplace, a full basement and a built-in two car garage.

The township assessor testified that in his opinion the year-round residence constructed in 1974 was unnecessary for the camp and thus should not have been exempt from property tax in 1975. In 1971 the camp had obtained a building permit to improve various camp buildings, including the caretaker's quarters. The assessor stated that in 1971 the living quarters for the caretaker were generally made more livable and were sufficient for a caretaker. However, the assessor was not sure of his own knowledge whether the indoor plumbing in the former caretaker's quarters had been installed as of 1971 and he was unsure whether the quarters had insulation. He said that he inspected the property in 1971 and was told that the renovation of the caretaker's quarters at that time as being done because the camp wanted someone on the premises full-time. He admitted that the caretaker's quarters were the only part of the entire camp premises which would have been acceptable for year-round living prior to the construction of the full-time residence in 1974.

The camp director testified for Camp Brett-Endeavor. He stated that he was the director for the 1972 summer camp season from mid-June to late August. He also stated that he periodically visited the camp on weekends before the camp season to turn on the water and otherwise get the camp ready for the campers. He testified that none of the buildings on the camp premises was winterized as of 1972. He testified specifically that he stayed at the former caretaker's quarters during 1972 on weekends before the summer season, during the time that the quarters were being renovated. As of then the cottage had no water or plumbing; it was supplied with water from a hose leading from the camp's summer water source. The director testified that prior to the renovation of the caretaker's quarters the camp had employed deer hunters during deer season as caretakers but had had no other persons acting in that capacity. According to the director, the renovated quarters as of 1972 would have been suitable for year-round occupancy for a

single person or a young married couple. He stated that when the camp season ended in 1972 the camp made arrangements with an individual and his wife to act as caretaker from mid-September to June 1973. This arrangement was unsatisfactory because of the personnel involved. Another individual was engaged to act as a caretaker during the 1973–1974 year, but this did not work out well either and the camp had to retain a lawyer to have the individual removed from the premises.

The director testified that he served full-time as director during the 1972 and 1973 summer camp seasons. During the off-season he went to the camp on weekends and weeknights for various business purposes. He maintained the records of the camp at his home in Scotch Plains where he administered details pertaining to the summer food program and other matters which needed attention during the off season.

In the summer of 1973 the trustees of Camp Brett-Endeavor decided to build a full-time residence and asked the director to be both the year-round caretaker and the summer director of the camp. The director and his family moved into the home at about Thanksgiving 1974. The camp director testified that the house was constructed so that it would be suitable for a family in the event future caretakers had families as he did. The director each year uses the house to interview many staff applicants. In addition, the house is used for occasional trustee meetings and for retention and security of camp records. As a result of the permanent residence being available for the di-rector/caretaker, the camp has been able somewhat to extend its programs from that of a strictly summer camp to that of a camp providing activity during certain weekends of the year.

On cross-examination the director stated that he is employed full-time as an eighth grade English teacher at a junior high school in Scotch Plains. He commutes from his residence at Camp Brett-Endeavor five days a week during the school year. He pays no rent for the camp residence but pays the utilities and is responsible for minor repairs. He also stated that the camp residence is somewhat smaller than the house he previously had

in Scotch Plains. The director conceded that the camp could function with a nonresident director if there were a good local caretaker who maintained communication with the camp trustees and director.

Camp Brett-Endeavor also presented the testimony of a witness who was the president and a trustee of the camp organization during 1972 and 1973. The trustee testified that the camp needed a full-time caretaker because of the expansion the camp had undergone over the years, there being many new cottages and other buildings on the premises. He stated that there had been a security problem at the camp, particularly during the winter months. According to the trustee, the camp had had problems with prior caretakers. The trustees felt that the present director would be of greater benefit to the camp if he lived on the camp property. The trustees were also aware that they were in need of a permanent office with meeting room facilities. The trustee testified that the board was aware it could not afford to pay a salary to a caretaker, and the offering of housing as a form of remuneration was attractive to the board. He also testified that the board was of the opinion that if they engaged a married person with a family, there would be more likelihood of someone being on the premises almost all the time. The trustees determined that it was therefore necessary to construct a home adequate to house a family.

The trustee stated that it was a substantial expense for the camp to construct the house in 1974, but that the board had looked into a further expansion of the renovated caretaker's quarters and determined that it would be cheaper to build a new house than to remake the old quarters. It was the opinion of the trustees that they had no alternative to having someone on the premises full time. They felt that the old caretaker's cottage was not an adequate year-round facility because the same building was used for the camp director and his family in the summer. They felt that a full-time caretaker would require his own home, so that they would still have to have built a summer house, at the very least for a caretaker, if the director resided in the original caretaker's house in the summer. The

trustees felt that the full-time residence constructed in 1974 had achieved its purpose and that the need for a full-time person on the premises has continued and in fact increased.

The camp also presented the testimony of the wife of the camp director/caretaker. Her testimony was corroborative of the testimony of her husband and of the president and trustee of the camp. In addition, she testified that she had a responsibility as assistant director of the camp, particularly with respect to the female campers. She also offered the opinion that the caretaker's quarters which were enlarged in 1972 were adequate for a family during the summer because the family was outside most of the time, but that the facilities were not adequate for a family year-round because they consisted of only a small kitchen, living room, kitchen, bath and two bedrooms, one of which had to accommodate three children.

The director's wife also testified that the presence of her family has deterred vandalism. She, in fact, has chased hunters from the property and there has been no vandalism on the premises during the time they have lived there. According to a statement placed into the record by the chief of police of the township, vandalism was "extremely high" on the property before someone resided on the premises full-time, and occupancy of the property has eliminated all vandalism. In fact, the Clinton Township assessor testified that when he went to inspect the property in 1976, he drove in the driveway of the camp and the camp director's wife came out to inquire who he was and why he was there. This statement corroborates the testimony of the director's wife that she has engaged in efforts to oversee the security of the camp property. In addition, Camp Brett-Endeavor offered into evidence a communication from the American Camping Association stating that it is very common for a summer camp to have a family living on the campgrounds 12 months a year for reasons of security, repairs and maintenance, and assistance to the camp in developing programs beyond the summer season.

■ The evidence in this case is persuasive that the year-round residence of the director/caretaker at Camp Brett-Endeavor should have been exempt from tax for 1975. The residence was constructed to be and is used as an integral part of the camp operation and thus meets the first part of the two-fold test for exemption. The camp office is located in the residence. Administrative responsibilities of the camp are conducted from the director's home. The dwelling is used for business meetings, staff interviews and the safe-keeping of records. There is no delineation at the camp between the director/caretaker's residence and the remainder of the camp. The accommodations provided to the director and his family are as much a part of the camp as are the dining hall and camper's cabins. Rather than being primarily a convenience to the director, the fact that the director now must commute five days a week to his teaching job in Scotch Plains results in a substantial inconvenience to him. The residence was constructed primarily for the benefit of the camp rather than for the benefit of the director.

The residence also meets the second part of the exemption standard in that it is reasonably necessary for the proper and efficient operation of the camp. The overriding consideration in this regard is the need for a year-round presence at the camp for security and maintenance reasons. Perhaps many of the administrative aspects of the camp could have been attended to elsewhere, but security is essential to a facility such as Camp Brett-Endeavor which has numerous buildings, a swimming pool and other improvements. Prior attempts by the camp to attract part-time caretakers failed. The trustees, in a reasonable exercise of their discretion, determined that the dwelling in question was necessary in order to attract a family whose presence and activity would safeguard the premises and enhance its use for camp purposes. This purpose was accomplished by the construction and use of the director/caretaker's residence.

Judgment will be entered by the Clerk of the Tax Court affirming the judgment of the Hunterdon County Board of Taxation.