WASHINGTON CEMETERY ASSOCIATION AND DEGEL HABONIM CEMETERY ASSOCIATION, PLAINTIFF, v. TOWNSHIP OF SOUTH BRUNSWICK AND JOHN J. DEGNAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY AND THE NEW JERSEY CEMETERY BOARD, DEFENDANTS.

Tax Court of New Jersey

June 26, 1980.

*W. Leonard Newman,* for plaintiffs.

*Edward L. Picone, Picone & Geller,* for defendant, Twp. of South Brunswick.

Honorable *John J. Degnan,* Attorney General, by *Mark S. Rattner,* Deputy Attorney General, for defendants, State of New Jersey and New Jersey Cemetery Board.

ANDREW, J. T. C.

This is an exemption from local property taxation case. The Middlesex County Board of Taxation concluded that the two buildings owned by Washington Cemetery Association and Degel Habonim Cemetery Association were not exempt from the local property tax imposed by the assessor of the Township of South Brunswick. Plaintiffs seek review of that determination in this court.

There is no dispute as to the essential facts. The sole witness presented was Maynard Klorman, the general manager of both

the Washington Cemetery Association and the Degel Habonim Cemetery Association (now known as the Floral Park Cemetery Association).

Mr. Klorman served as the office manager for both plaintiffs until 1958 at which time he became the general manager and has remained in the latter capacity until now. The Washington Cemetery Association provided housing on the cemetery grounds in a two family residential dwelling for two laborers and their families. The purpose was to have workmen available 24 hours a day to excavate grave sites. This around-the-clock availability was necessitated by the religious beliefs of many of the clients of the cemetery which beliefs mandated interment as soon as possible after death and in no event later than 24 hours after death. Mr. Klorman indicated that such burials were expected to be made on 2 hours notice and that 20 to 25 interments had been effected between midnight and one o'clock a. m., during the course of a year. During the last few months there were 3 or 4 burials in the late evening.

The general manager stated that there were always two laborers on call to accommodate interments on short notice. He observed that prompt interment was of such importance to some of their clients who owned burial plots in the cemetery that the friends and relatives of the deceased would attempt to dig the grave themselves, if the cemetery association did not provide this service promptly. This was especially hazardous in the late evening and would also tend to cause mislocations since the exact grave sites were not easy to determine without specific familiarity of cemetery grave locations.

Although timely service was important, security was the primary reason for the necessity for the cemetery workers to live on the grounds. There had only been one incident of vandalism or malicious mischief, that being an overturned monument. This low level of vandalism was attributed to the presence of the laborers on the cemetery premises. The workers were also able to observe automobiles coming on the cemetery grounds at night and to react to these situations by confronting

the late visitors and inquiring about their purpose for being in the cemetery at a late hour. It should be noted that neither cemetery was fenced.

The apartments which the laborers occupied constituted the entire premises. There was no other business operation conducted at the building. The laborers did not pay rent but were paid the same wages as those other laborers performing service for the cemetery who did not live on the grounds. The cemetery association provided the living quarters free of any rental because it was practical to have the workers available when needed.

The caretaker-superintendent and his wife live in an apartment which is adjacent to Washington Cemetery. This apartment is attached to an office and is located in Degel Habonim Cemetery. The caretaker-superintendent is available by phone 24 hours a day. It is his function to marshall and supervise the men and equipment necessary to service the two cemeteries. He insures that men and equipment are available as and when needed. It is also the responsibility of the superintendent to see to the decedent's family at a burial and to maintain the records of the cemetery. Mr. Klorman testified that any large cemetery such as the plaintiffs' would have a superintendent living on the grounds.

The issue presented is relatively narrow. Are the two buildings used as residences entitled to an exemption under *N.J.S.A.* 8A:5–10 because they are ". . . buildings . . . used for the operation and maintenance of lands [dedicated for cemetery purposes] . . .?"

The Township argues that the plaintiffs have failed to demonstrate that the residences were reasonably necessary for the efficient operation of the cemeteries and therefore the exemption claim should be denied. The plaintiffs assert that both residences are essential to the effective operation of the cemeteries and should be exempt from local property tax pursuant to *N.J.S.A.* 8A:5–10.

The pertinent provisions of *N.J.S.A.* 8A:5–10, a part of the "New Jersey Cemetery Act", *N.J.S.A.* 8A:1–1 *et seq.*, and pursu-

ant to which the plaintiffs claim tax exemption for the residences, provides as follows:

"Cemetery companies shall be exempt from the payment of any real estate taxes on lands dedicated for cemetery purposes. . . . The cemetery property of whatsoever nature of any cemetery company, and lands dedicated prior to or in accordance with this act shall be exempt from all taxes . . . or assessments. . . . *The aforesaid exemptions shall apply also to all land, structures, buildings, and equipment used for the operation and maintenance of said lands so dedicated.*" (emphasis supplied)

The statute provides that lands dedicated for cemetery purposes shall be exempt from real estate taxes. It also provides that this exemption will also apply to land and buildings used for the operation and maintenance of lands dedicated for cemetery purposes. It is apparent that *N.J.S.A.* 8A:5–10 provides two different standards to determine the exempt status of cemetery property. If the plaintiffs satisfy the requirement that their lands are dedicated for cemetery purposes, then all land and buildings used for the operation and maintenance of lands so dedicated are also exempt.

There is no dispute that the land of the plaintiffs', other than the subject properties, is dedicated for cemetery purposes as that land is and has been determined by the assessor to be exempt. The question to be resolved, then, is whether the buildings which are the subject of this proceeding are used for the operation and maintenance of the lands of the Washington Cemetery Association and the Degel Habonim Cemetery Association. This court is mindful that generally statutes granting exemptions from taxation are strongly construed against those seeking exemption. *Teaneck v. Lutheran Bible Institute,* 20 *N.J.* 86, 90, 118 *A.2d* 809 (1955). This rule of construction requires that doubts are to be resolved against those seeking statutory exemption since the fundamental principles of our taxing statutes are that all property should bear an equitable share of the public burden of taxation. *Ibid.; Julius Roehrs Co. v. Division of Tax Appeals,* 16 *N.J.* 493, 497–498, 109 *A.2d* 611 (1954). The court is also aware that strict construction does not justify distorting the language of a statute or its legislative design. *Boys' Club of Clifton v. Tp. of Jefferson,* 72 *N.J.* 389,

398, 371 *A.*2d 22 (1977). The present issue will be considered with these principles in mind.

The precise issue involved has not previously been given judicial consideration in this state. However, the language used in *N.J.S.A.* 8A:5–10 is sufficiently analogous to the language in *N.J.S.A.* 54:4–3.6 to make a comparison and review of reported cases under the latter statute of assistance. *N.J.S.A.* 54:4–3.6 provides for a number of exemptions for various activities provided the buildings are either "actually used" for certain purposes or "actually and exclusively used" for other prescribed purposes. A reading of the last sentence of *N.J.S.A.* 8A:5–10 discloses a test for exemption that is similar to the "actually used" test provided by *N.J.S.A.* 54:4–3.6 for colleges, schools, academies and seminaries. This test is not as restrictive as the "actually and exclusively used" test applied to buildings for religious, charitable or hospital purposes.[1]

In *Pingry Corp. v. Hillside Tp.*, 46 *N.J.* 457, 217 *A.*2d 868 (1966) our Supreme Court was called upon to decide whether seven faculty houses and the land upon which they were situated were exempt from real property taxation under *N.J.S.A.* 54:4–3.6, specifically, that portion of the statute which exempts "All buildings [which are] actually used for colleges, schools, academies or seminaries." *N.J.S.A.* 54:4–3.6. The seven faculty houses were located at one end of the Pingry campus in an enclave. The court framed the issue as follows:

> "The question then becomes: Are buildings and the lands upon which they are built and used to house the headmaster and the faculty at a country day school, exempt from taxation under *N.J.S.A.* 54:4–3.6, i. e., are they 'actually used' for school purposes?" (at p. 463, 217 *A.*2d at p. 871).

Concluding that the faculty houses were actually used for school purposes the court considered these factors: the absence of a profit-making arrangement in the rental contract; the desirability of providing available housing at or near the school and

---

[1]For an analysis of our Supreme Court and Appellate Division opinions construing the "actually and exclusively used" provision of *N.J.S.A.* 54:4–3.6, see *Township of Clinton v. Camp Brett Endeavor, Inc.*, 1 *N.J.Tax* 54 (Tax Ct. 1980).

whether the provision of housing for its faculty is reasonably designed to further the educational purposes of the school.

In *Blair Academy v. Blairstown Tp.*, 95 *N.J.Super.* 583, 232 *A.2d* 178 (App.Div.1967) the court applied the test announced in *Pingry, supra,* and found eight faculty houses and a residence occupied by the business manager-treasurer exempt from taxation. The court noted that this school official was required to live on the school grounds and had to be available on a 24 hour a day basis. Therein the court stated:

> "A school official acting in these many capacities may be housed on the school's premises *for the convenience of the institution.* Residential quarters of a tax exempt institution used for such a purpose are also tax exempt." (emphasis supplied, at p. 588, 232 *A.2d* at p. 181).

Despite the fact that the *Pingry* court was construing *N.J. S.A.* 54:4-3.6 and not *N.J.S.A.* 8A:5-10, I find that the operative language in each statute is sufficiently similar to utilize the decisional law analyzing the "actually used" language of *N.J. S.A.* 54:4-3.6 as a guide to the construction of *N.J.S.A.* 8A:5-10.

■ Applying the factors considered by the *Pingry* court, I make the following findings.

There is an absence of a profit-making arrangement in the rental contract. No rent is charged the laborers for their apartments on the cemetery grounds. No evidence was adduced at the hearing to indicate that the superintendent paid rent for his living quarters. It is desirable for the plaintiffs, cemetery associations, to provide housing on the cemetery grounds. The uncontroverted testimony of the general manager of the cemetery association was that having the on-site housing for the superintendent and the laborers was the reason for the very low level of vandalism which the cemetery experienced. It was necessary to have the superintendent and the laborers on the grounds in order to properly service the clients of the cemeteries and their around-the-clock presence on the cemetery grounds insured that the laborers would be available to work despite inclement weather. The superintendent was also available on a 24 hour a day basis. His availability was necessitated by the need to provide men and equipment essential to accommodate their clients' requirement for prompt interments which was

dictated by the religious beliefs of many of the clients of the cemetery.

The nature and extent of the duties of the superintendent and the laborers are such that they were required to be on call 24 hours a day and the operational convenience of the cemeteries was and is greatly served by the location of the residences on the cemetery grounds. The administration of the affairs of these cemeteries requires that these employees be located on the grounds to the end that the cemetery operation may be efficiently conducted and supervised and to permit emergency matters to be effectively handled as they arise.

I find that the housing for the laborers and the superintendent is provided not for the employees convenience but rather because it is essential to the operation of the cemeteries.

I conclude that the buildings provided the superintendent and the laborers and the land upon which they are situated are reasonably designed for the efficient functioning of the cemeteries and are "used for the operation and maintenance of lands" dedicated for cemetery purposes and are therefore exempt from local property taxation pursuant to *N.J.S.A.* 8A:5–10.

Accordingly, the Clerk of the Tax Court is instructed to enter judgments reversing the judgments of the Middlesex County Board of Taxation and granting the subject parcels an exempt status.